**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| AMY ARZAMENDI,<br>MICHAEL C. ORLOFF, and<br>BROOKE STADLER, | ) ) ) ) | |
| On behalf of themselves and a class of similarly situated individuals, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| LLOYD J. AUSTIN, III<br>Secretary of Defense<br>1000 Defense Pentagon<br>Washington D.C., 203500-0001<br>(in both his individual and official capacity), | ) ) ) ) ) ) | Case No.: |
| KATHLEEN H. HICKS<br>Deputy Secretary of Defense<br>1010 Defense Pentagon<br>Washington, D.C. 20301-1010<br>(in both her individual and official capacity) | ) ) ) ) ) ) | CLASS ACTION COMPLAINT |
| VICE ADMIRAL<br>GILBERT R. CISNEROS, JR.<br>Under Secretary of Defense for Personnel<br>and Readiness<br>4000 Defense Pentagon<br>Washington D.C. 20301-4000<br>(in both his individual and official capacity), | ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED<br><br>July 24, 2023 |
| THE DEPARTMENT OF DEFENSE<br>1000 Defense Pentagon<br>Washington D.C., 203500-0001 | ) ) ) ) | |

## CLASS ACTION COMPLAINT

1)      COME NOW, Named Plaintiffs Amy Arzamendi, Michael C. Orloff and Brooke

Stadler (together, "Named Plaintiffs") *et al.,* together with all Plaintiffs identified in this

1

Complaint and other as yet unidentified Plaintiffs who may be party to this Class Compliant ("Plaintiffs"), by and through their attorneys, pursuant to Federal Rule of Civil Procedure 15(a)(1)(A) and submit this Class Complaint, and state the following in support of their Class Complaint and Jury Demand against Lloyd J. Austin III, *et al.,* ("Defendants" or "the Department").

## **INTRODUCTION**

2)      This action arises out of a massive injustice that the Department of Defense ("DoD" or "Department") inflicted on likely thousands of its employees during the pandemic of 2020 to 2023.

3)      In implementing Safer Federal Workforce Task Force recommendations, DoD, through its leadership, quashed the rights of thousands of its employees by requiring them, despite their sincere religious beliefs against it, to get injected with the COVID-19 vaccine.

4)      Although the COVID-19 pandemic has been officially over for several months, victims are still feeling the repercussions of the ostracization and vilification of those with religious and medical objections to the vaccine and other adverse actions by public and private employers.

5)      Indeed, the divisive, authoritarian policies that DoD forced on employees stripped many of their religious freedoms, creating a group of second-class employees who suffered (and continue to suffer) harms on a most basic, private, and personal level, as well as in the terms and conditions of their employment.

6)      In the instant case, Plaintiffs (civilian employees of DoD) lived under constant fear and duress, including the threat of discipline and termination if they did not follow a

2

mandate that has since been enjoined as likely to be found unlawful,[1] or agree to arbitrary, invasive, and unapproved testing and masking protocols. As such, they were put in the untenable position of being forced to choose between their livelihoods and being faithful to the deeply held tenets of their religion. These and other harms outlined below demand redress.

7)    This is a class action lawsuit filed on behalf of DoD civilian employees who experienced adverse the impacts of the Department's systemwide COVID-19 mandatory vaccination program. Plaintiffs Amy Arzamendi, Michael C. Orloff, and Brooke Stadler are the Putative Class Agents ("PCAs") and represent all Plaintiffs, including those named below as well as the potential class of all DoD civilian employees who suffered religious and disability discrimination at the hands of the government based on its COVID-19 policies.

8)    The action is grounded in Defendants' authoritarian imposition of an Emergency Use Authorized (EUA) vaccine brought to market at "warp speed."[2]

9)    It is also based on Defendants' imposition of adverse, unapproved, and illogical consequences (EUA testing, and EUA mask wearing and distancing) on those who refused to comply with the mandate for religious reasons. In forcing these involuntary protocols on Plaintiffs, Defendants violated Plaintiffs' right to religious freedom and failed entirely in their duty to defend Plaintiffs' sincerely held religious beliefs and protect them from discrimination.

10)    DoD's stated mission is "to provide the military forces needed to deter war and

---

[1] *See, Feds for Medical Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023)
[2] Three (3) separate COVID-19 EUA experimental unapproved medical products have been developed and used in the U.S. The manufacturers are Moderna, Pfizer-BioNTech, and Johnson & Johnson. None of the products is a vaccine in the traditional meaning of the word. Vaccines developed to eliminate diseases like polio, smallpox and the measles provide individuals with immunity from contracting the condition. These products do not provide individuals with immunity from contracting COVID-19, and they do not stop transmission of the disease. These products are gene-altering experimental therapies and should not be confused with fully approved, FDA sanctioned "vaccines." Nevertheless, for purposes of expediency, Plaintiffs will use the generic term "vaccine," but do not intend to imply official "vaccine" status, as the term is ordinarily defined.

protect the security of our nation." As part of its mission related to its personnel, the

Department's website states:

> We are committed to making the DoD a workplace of choice that is characterized by diversity, equality, and inclusion. We remain steadfast in our commitment to promote an environment *free from barriers that may prevent personnel from realizing their potential* and rising to the highest levels of responsibility within the Department. . . . We believe diversity is the key to innovation, inclusion is imperative for cohesive teamwork, and equality is critical to Total Force readiness."
>
> Office for Diversity, Equity, and Inclusion – Department of Defense website, https://diversity.defense.gov/DoD-Diversity-and-Inclusion-Initiatives/ (emphasis added).

11)    Yet the Department's adoption of mandatory COVID-19 vaccines failed to "promote an environment free from barriers that may prevent personnel from realizing their potential and rising to the highest levels of responsibility within the Department." *Id.*

12)    To the contrary, DoD treated its religious employees with contempt and disdain, as it failed in its duty to accommodate them, treated them differently (and much worse) than employees who did not seek religious exemptions, and created a hostile work environment in which animus toward religious objectors was omnipresent.

13)    DoD's screening / testing requirements also discriminated against Plaintiffs by treating them as disabled – as if they were pariahs who were spreading (or would imminently spread) a deadly disease to the work population, notwithstanding that employees who had been fully vaccinated were acquiring and transmitting COVID-19.

14)    Defendants proceeded to create a toxic and hostile work environment by constantly coercing Plaintiffs to get vaccinated, even after they filed their requests for religious exemptions. The hostile work environment was exacerbated by Defendants' perception that Plaintiffs were disabled. In treating them as pariahs, they were made to feel dirty, set-apart,

disgusting, and unwanted. These actions distinguished Plaintiffs from their peers, gave public disclosure of their private and protected health information, and subjected them to open harassment and public humiliation by leaders and coworkers.

15)    Defendants violated Title VII of the Civil Rights Act, the Rehabilitation Act, the Religious Freedom Restoration Act, and the 1st and 5th Amendments to the U.S. Constitution when they pressured and coerced Plaintiffs to violate their religious beliefs by taking the vaccine, treated them as disabled, failed to accommodate their religious beliefs, incessantly threatened them with termination, and created a hostile work environment.

## PARTIES

### Named Plaintiff Amy Arzamendi

16)    Plaintiff and PCA Amy Arzamendi has worked as an auditor for the DoD since joining the Defense Contract Audit Agency ("DCAA") in February 2020.

17)    Ms. Arzamendi uprooted her life and her family, including her three children, to move from Austin to Fort Worth, Texas, in 2020, to accept a job with the Defendant.

18)    She works out of the DCAA facility in Fort Worth, Texas.

19)    Ms. Arzamendi has never had a negative performance review and her performance has always been satisfactory.

20)    Ms. Arzamendi is a Christian who has strongly held beliefs about what she puts into her body. She believes that her body is God's temple and is careful about the foods she eats and the medicines she takes. She also believes that abortion is morally wrong and therefore could not partake in a medical product (vaccine or otherwise) that was tested, produced or in any way tainted by aborted fetal cells, as was the case with the vaccine.[3] Arzamendi, DD Form 3177

---

[3]*See, e.g.*, Fred Guterl, *COVID-19 Vaccines and Fetal Tissue: The Science and Controversy Explained*, NEWSWEEK,

Request for Religious Exemption to COVID-19 Vaccination Requirement, November 6, 2021

("Arzamendi Religious Exemption Request")

21)     Accordingly, when she learned about the DoD's order requiring the vaccine for all DoD civilian employees, she filed a request for a religious exemption to the vaccine on November 8, 2021.

22)     Like all Plaintiffs, she used DD Form 3177, which was a form created by and required by DoD.

23)     Ms. Arzamendi was also required to attest to her vaccination status using DD Form 3175, another form required the DoD. On that form, she indicated that she was not vaccinated and that she had applied for a religious exemption to the vaccine that was still pending.

24)     Despite filing a timely exemption request, DoD and its underlying agencies never adjudicated Ms. Arzamendi's religious exemption request. They never spoke to her about it, followed up with questions, or asked for clarification. Rather, they ignored her request (as well as those of all other Plaintiffs) and let Ms. Arzamendi languish in a cloud of fear and anxiety, wondering if each new day was the day she would be disciplined or terminated for failing to get the vaccine.

25)     She sent an email request to the appropriate personnel (Kathryn Fields, EEO Assistant) on January 6, 2022, asking for an update on the exemption review process.

---

March 21, 2021, at https://www.newsweek.com/covid-19-vaccines-fetal-tissue-science-controversy-explained-1575863. ("Fetal-cell lines played a vital role in the development of all three vaccines. Moderna and Pfizer used Van der Eb's original cell line, called HEK 293, in the testing of their coronavirus vaccines—that is, scientists first developed the vaccines using their mRNA technologies and subsequently tested them on lab-cultured HEK 293 cells, ancestors of the original cells that Van der Eb took from an embryo almost 50 years ago. Johnson & Johnson used a different fetal-cell line, called PER.C6, that was cultured in Van der Eb's lab in 1995. While Moderna and Pfizer used fetal cells for testing their vaccine after it was already produced, J&J used fetal cells as tiny "factories" that produced the active ingredient in its vaccine.")

26)    Although she filed her religious exemption request in early November 2021, Ms. Fields responded two months later stating that, "I do not have a timeline on when and how the review process will be."

27)    When presented with information that testing, masking, and distancing protocols would be required, Ms. Arzamendi filed a request for a religious exemption to these protocols. Significantly, that exemption request was quickly adjudicated (within a matter of weeks), and ultimately denied.

28)    From the time she submitted her request for a religious exemption, Ms. Arzamendi lived in constant fear of having to choose between her personal faith and her livelihood. She felt single-out, dirty, set-apart.

29)    As an extremely private person, it was stressful to share her vaccination status and the details of her religious faith with her employer. It was even more stressful as she received constant emails from her employer pressuring her to take the vaccine or follow testing protocols – even as her religious exemption request to the vaccine was still pending.

<u>Named Plaintiff Michael C. Orloff</u>

30)    Plaintiff and PCA Michael C. Orloff has faithfully served his country with distinction, both in uniform and out, for over 28 years. He has commanded men in combat in both Iraq and Afghanistan and has seen combat five times losing several good friends along the way. After 22 years of honorable service in the Army, Mr. Orloff began working as a contractor for DoD in 2013, supporting the Army's Special Operations Acquisition and then later as an Army civilian working at Fort Belvoir as an Assistant Program Manager within the Army's Enterprise Information Systems, where he has an exceptional performance record. As a life-long Christian, he continues serving his country honorably. He states, "I do not make decisions based

on fear or comfort. My decisions are made based on what I think or know to be right and wrong. After much prayer and research, I know that not taking the current COVID-19 shot(s) is the right decision for myself and my family."

31)    Like other Plaintiffs, Mr. Orloff filed a request for religious exemption to the vaccine on November 4, 2021, using DD Form 3175.

32)    He also attached a memorandum in support of his request.

33)    In his request for a religious accommodation, Mr. Orloff explained, "I believe these shots to be nefarious and an affront to God. Among the many reasons I'm opposed to the vaccine is the use of aborted fetal cells or the fetal tissue in the vaccine itself or the use of fetal cells/ tissue in the research and development of the [Emergency Use Authorization] vaccine.

34)    Mr. Orloff quoted scripture throughout his memorandum, stating for example that:

> It is my sincere belief that if am vaccinated with anything currently available as COVID-19 vaccines, I would be participating in abortion or murder and that this would be sinning against God. Thou shall not murder. Exodus 20:13. All children are gifts from God and no matter the circumstances surrounding an abortion. I cannot in good faith receive anything into my body that is part of a process or result of abortion. I only wish that I had known sooner in my lifetime that aborted fetal cells were used in the process of creating vaccines. I would never have agreed to receive anything that follows that process. In addition, I was never provided informed consent.

35)    Mr. Orloff also presented a letter of support from his minister, attesting to the sincerity of Mr. Orloff's religious beliefs against the vaccine. Among other things, the minister states, "In accordance with Mr. Orloff's sincerely held religious belief, receiving the COVID-19 vaccine is not morally permissibility [sic] and would violate his conscience. His refusal of the COVID-19 vaccine is consistent with his refusal to engage in other activities he views as a violation of conscience, a clear demonstration of sincerity." Letter from Reverend Vincent Garcia to Whom it May Concern, October 22, 2021. He explains how, "Mr. Orloff's beliefs

teach him how there is a sanctity of human life. According to his understanding of the Christian Bible, human life begins at conception, thus abortion is never morally permissible." *Id.*

36)     Despite providing a fulsome explanation of his religious beliefs against the vaccine, including supporting documentation from his pastor, Mr. Orloff's request (and those of all other Plaintiffs who filed requests for religious accommodation), was never adjudicated.

37)     As with other Plaintiffs, not only was Mr. Orloff's religious vaccine exemption request NOT adjudicated, but Defendants never processed it, never asked for additional information or clarification, and never engaged in even the slightest interactive process to help them make a determination as to whether or not his religious accommodation request would be granted or denied.

38)     Consequently, from the pendency of his religious accommodation request (from November 4, 2021), until President Biden revoked the vaccine mandate for federal employees in May, 2023, Mr. Orloff lived in constant fear that DoD would eventually deny his request and he would be disciplined and/or terminated for failure to get the vaccine.

39)     Mr. Orloff was also subject to constant punishment for his religious objections to the vaccine in the form of discriminatory testing, masking, and distancing requirements, including demonstrative public testing in front of coworkers. These protocols were not required of employees who did not file requests for religious (or medical) accommodation.

40)     Mr. Orloff was further denied important business travel and was denied work and promotional opportunities required to succeed and/or advance in his job; all because of his sincere religious objections to the vaccine.

41)     For example, Mr. Orloff states he was:

> [U]nable to grow in my professional capacity as an acquisition officer working for the Army. I was unable to speak to people in the industry that I work in to

understand the latest technologies that operate in the acquisition space. I was also prevented from hearing senior military leaders speak on behalf of acquisitions in the upcoming years that greatly impact my career field and path. I lost the opportunity to attend a conference with my peers and to be part of the team and suffered the embarrassment of not being allowed to attend with my colleagues. I would have been exposed to many emerging technologies and senior leader mentorship but that day I lost or was not afforded that opportunity due to my COVID vaccination state. In order to gain entry into the event, attendees must show proof of COVID vaccination status.

42) Mr. Orloff suffered substantial harm, living under the oppressive and coercive policies of DoD. He summarizes:

Since this discrimination started back in the summer of 2021, I have been under the duress of losing my job and under enormous stress. My supervisor Miranda Coleman barely spoke to me once she found out that I was not going to get COVID shot. I am not invited to meetings outside my Line of Effort. I wake up in the middle of the night with panic attacks. I am unable to sleep much at night due to the constant stress of losing my livelihood and the thought of having to sell my home. For weeks on end, the constant barrage of COVID emails stating that you have till 22 November 2021 to get your "vaccine" or face disciplinary actions.

43) Mr. Orloff is stoic about his situation and very much wants to help others avoid going through what he suffered:

As a Christian, my sincere religious beliefs prevent me from defiling my mind, body, and soul. Because of my sincere Christian belief, it has created a disparity at my workplace. My dedication to the mission has never wavered, see my reviews as a reference, my dedication to the soldiers in which [sic] whom I serve and my dedication to the Federal Civilian workforce is unwavering regardless of how bad I have been treated for not getting the EUA. I hope my colleagues never have to face the same discrimination, retaliation, or mistreatment that I have endured.

### Named Plaintiff Brooke Stadler

44) Plaintiff (and PCA) Brooke Stadler worked for DoD beginning on July 31, 2008, until she was constructively discharged on June 1, 2022. She reported to the Department of Defense Education Activity, where she was employed as an elementary school teacher.

45) Ms. Stadler was assigned to Fort Stewart from 2008 to 2016, Quantico, Virginia

from 2016 to 2019 and Volgeweh, Germany from 2019 to 2022.

46)    Ms. Stadler went above and beyond in her work and received nothing lower than "outstanding" or "fully successful" as a performance rating throughout her time with DODEA. She was a mentor both within the school and worked closely with the districts in which she worked.

47)    Ms. Stadler has been a practicing Christian since childhood and her beliefs conflict with the vaccine mandate and testing screening protocols implement by DoD. She states:

> When I was created, I was made in the image of God. I was knit together in my mother's womb and was given everything that made me unique. God created in me an immune system that works to protect me against the evils of this world. It is through my faith that I believe God has equipped my body to fight against a great number of evils that attack my system. This is the reason why I object and do not take vaccinations, medications, or treatments that my body and immune system can fight off on their own. This has been my stance for many years in which I have discontinued the use of certain medications, as well as exempted out of treatments of illnesses in which my body can expel on its own.

48)    She also states:

> Teaching is far more than simply a job that I have, but it is what I was created to do and is at the very core of who I am. My decision, after much prayer, counsel, research, and faith to refrain from getting the COVID-19 shot(s) has taken this away from me. This striping [sic] of part of my identity is based not on any aspect of my performance as a teacher or leader, but rather on my sincerely held belief in God."

49)    Ms. Stadler filed a request for a religious exemption to the vaccine on November 6, 2021.

50)    Like all Plaintiffs, she used DD Form 3177, which was a form created and required by DoD.

51)    Ms. Stadler was also required to attest to her vaccination status using DD Form 3175, a form that DoD requires. On that form, she indicated that she had not received the vaccine and that she had a religious exemption request pending.

52)     Despite filing a timely exemption request, DoD and its underlying agencies never adjudicated Ms. Stadler's religious exemption request. They never spoke to her about it, followed up with questions, or asked for clarification. Rather, they ignored her request (as well as those of all other Plaintiffs) and let Ms. Stadler languish in a cloud of fear and anxiety, wondering if each new day was the day she would be disciplined or terminated for failing to get the vaccine.

53)     Ms. Stadler inquired about the status of her vaccination exemption request on January 22, 2022, in an email to the Vaccination Exemption Process Team, but she received a response that no update was available. The email stated however, "Please be assured the Vaccination Exemption Process Team is working the submitted exemption requests."

54)     There was never any evidence the Process Team or anyone else "worked the submitted exemption request."

55)     On April 12, 2022, Ms. Stadler also filed a religious accommodation request to avoid the testing protocols that DoD had implemented for employees who could not take the vaccine for religious or medical reasons. She also requested to be moved to another school in the area that did not require testing due to low transmission rates in the community.

56)     Unlike her request for an exemption to the vaccine, both of those requests for accommodation were adjudicated in short order (within six weeks) and ultimately denied on May 20, 2022.

57)     Ms. Stadler emailed leadership 16 times asking them to reconsider their decision not to allow her to move to a school with low community transmissions rates. Her employer completely ignored her requests.

58)     Instead, Ms. Stadler was placed on administrative leave for over four months

12

because she could not consent to the testing protocols, as they violated her religious beliefs about.

59)     Seeing the writing on the wall, and fearing for her job and her future, Ms. Stadler was forced to resign her position. As the sole provider for her family and fearing that termination from the federal government would negatively impact her future employment, Ms. Stadler made the decision amidst skyrocketing stress and anxiety. She decided to place her faith over her livelihood.

60)     Her last day of work was June 1, 2022.

61)     Throughout the pandemic, Ms. Stadler suffered tremendous stress, anxiety, and even physical illnesses because of DoD's treatment of her. She states:

> I had been taking personal days due to my anxiety and panic attacks and overall wellness. The continuing harassment of emails and verbal conversations continued to cause extreme stress, mental anguish, and was affecting my physical well-being.  The effects were not limited to raised blood pressure, constant anxiety, panic attacks, chest pain, migraine headaches, bowel issues, loss of sleep, loss of appetite, inability to focus, dizziness, nausea, and the constant worry of the unknown. These were and continue to be directly related to the mandate and [related protocols.]

62)     Indeed Ms. Stadler was forced to go to the emergency room due to the stress on November 7, 2021, where she was diagnosed with Stage 3 Hypertension. She was given medication and ordered to take a week off work which her employer denied.

63)     About the entire ordeal, Ms. Stadler states:

> This current year has been filled an enormous amount of stress and I have been under constant duress of losing my job and having a negative, inaccurate, representation of my teaching. These actions have nothing to do with my teaching but are a direct assault on my sincerely held religious beliefs regarding what is done medically with my body. Being a teacher is more than something I do or a job; it is part of who I am."

64)     Plaintiff Ryan Atteberry is an individual and employee or former employee of

DoD.

65)     Plaintiff Matthew Bonura is an individual and employee or former employee of DoD.

66)     Plaintiff Abigail Borowy is an individual and employee or former employee of DoD.

67)     Plaintiff Eric Cole is an individual and employee or former employee of DoD.

68)     Plaintiff Danielle Condon is an individual and employee or former employee of DoD.

69)     Plaintiff Barbara Crothers is an individual and employee or former employee of DoD.

70)     Plaintiff Jessica Daugherty is an individual and employee or former employee of DoD.

71)     Plaintiff Daniel Dorrell is an individual and employee or former employee of DoD.

72)     Plaintiff Cynthia Fellows is an individual and employee or former employee of DoD.

73)     Plaintiff Natasha Kepler is an individual and employee or former employee of DoD.

74)     Plaintiff Gina Lievanos is an individual and employee or former employee of DoD.

75)     Plaintiff Melissa Mathews is an individual and employee or former employee of DoD.

76)     Plaintiff Michael Kevin McAfee is an individual and employee or former

employee of DoD.

77) Plaintiff Gregory McKenzie is an individual and employee or former employee of DoD.

78) Plaintiff Jeffrey Olivier is an individual and employee or former employee of DoD.

79) Plaintiff Joni Palko is an individual and employee or former employee of DoD.

80) Plaintiff Renda Presser is an individual and employee or former employee of DoD.

81) Plaintiff Anthony M. Priestas is an individual and employee or former employee of DoD.

82) Plaintiff Kate Rathbun is an individual and employee or former employee of DoD.

83) Plaintiff Michael Schaecher is an individual and employee or former employee of DoD.

84) Plaintiff Lidia Scinski is an individual and employee or former employee of DoD.

85) Plaintiff Marc Schatmeier is an individual and employee or former employee of DoD.

86) Plaintiff Brittany Stallwood is an individual and employee or former employee of DoD.

87) Plaintiff Peter Watt is an individual and employee or former employee of DoD.

88) Defendant Lloyd Austin is the Secretary of Defense, which is an agency of the United States Government. The Secretary of Defense oversees the Defense Department and acts as the principal defense policymaker and adviser. Secretary Austin is sued in his official capacity

and in his individual capacity with respect to the RFRA claims.

89)    Defendant Kathleen Hicks is the Deputy Secretary of Defense. She was sworn in on February 9, 2021, and is in charge of the Defense Department's day-to-day business. Her primary responsibility is managing the defense budget and executing the defense secretary's priorities. Deputy Secretary Hicks is sued in her official capacity and in her individual capacity with respect to the RFRA claims.

90)    Defendant Gilbert Cisneros Jr. is Under Secretary of Defense. He was sworn in on August 2021, as the Under Secretary of Personnel and Readiness and is currently the Chief Diversity and Inclusion Officer for the Department of Defense to further advance the Department's goals of ensuring the workforce is representative and inclusive. He is sued in his official capacity and in his individual capacity with respect to the RFRA claims.

91)    Defendant Department of Defense provides the military forces needed to deter war, and to protect the security of the United States.

## MISNOMER/ ALTER EGO

92)    In the event any parties are misnamed or are not included herein, it is Plaintiffs' contention that such was a "misidentification," "misnomer," and / or such parties are / were "alter egos" of parties named herein.

## JURISDICTION AND VENUE

93)    Plaintiffs' claims arise out of Defendants' violation of Title VII, the Rehabilitation Act, RFRA and the United States Constitution.

94)    This Court has jurisdiction under 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 1331, 1346, 1361, 2201, under the United States Constitution, and pursuant to the Court's equitable powers.

95)     The Court also has jurisdiction pursuant to Title 28 U.S.C §1332 and 28 U.S.C. §1343(a)(4).

96)     The Court has jurisdiction, and Venue is proper, under 42 U.S.C. §2000e-5(f)(3), because many of the unlawful employment actions alleged took place in Texas. Venue is also proper under 28 U.S.C. § 1391(1)(B) because the United States, one or more of its agencies, and one or more of its officers in his or her official capacity are Defendants; and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, at the DoD's Fort Worth, Texas facility.

**STATEMENT OF FACTS**

Vaccine Mandate

97)     Health authorities declared COVID-19 to have reached pandemic status in March of 2020.

98)     On December 11, 2020, pursuant to a declaration entitled, *Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564 of the Federal Food, Drug, and Cosmetic Act*, 21 U.S.C. § 360bbb-3, the U.S. Food and Drug Administration (FDA) issued an Emergency Use Authorization (EUA) for the pharmaceutical manufacturer Pfizer's vaccine (the "BioNTech" vaccine), which it developed for the prevention of coronavirus disease caused by the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)("COVID-19" or "COVID").

99)     On December 18, 2020, FDA issued an EUA for Moderna's vaccine for the prevention of COVID-19.

100)     On February 27, 2021, FDA issued an EUA for Janssen (Johnson and Johnson)'s COVID-19 vaccine.

101)    On January 20, 2021, President Biden issued EO 13991, which established a Safer

Federal Workforce Task Force (the "SFWTF") and required masking and social distancing for

all federal employees. The Task Force was charged with "provid[ing] ongoing guidance to heads

of agencies on the operation of the Federal Government, the safety of its employees, and the

continuity of Government functions during the COVID-19 pandemic." 86 Fed. Reg. 7045 at

7046.

102)    On April 23, 2021, the FDA amended its Janssen EUA to warn of a "very rare and

serious type of blood clot in people who receive the vaccine."

103)    On September 9, 2021, the President issued Executive Order ("EO") 14043,

which required all federal employees to be vaccinated, subject to such exceptions as required by

law." 86 Fed. Reg. 50989. EO 14043 tasked every federal agency with implementing the EO to

the extent consistent with applicable law, *Id.* at 50990. The Agencies were to receive

"implementation" guidance from the SFWTF, which would issue guidance within seven days. *Id.*

104)    Simultaneously, the President stated that while "fully vaccinated" individuals are

"highly protected from severe illness even if [they] get Covid-19," and being fully vaccinated

renders these individuals "as safe as possible," he was nonetheless issuing vaccine mandates "to

protect vaccinated workers from unvaccinated co-workers." Katie Rogers & Cheryl Gay

Stolberg, *Biden Mandates Vaccines for Workers, Saying, 'Our Patience Is Wearing Thin,'* NEW

YORK TIMES, (September 9, 2021, updated November 12, 2021), at

https://www.nytimes.com/2021/09/09/us/politics/biden-mandates-vaccines.html.

105)    The President laid blame for the spread of COVID-19 squarely on the

unvaccinated, saying vaccinated America was growing "frustrated" with the 80 million people

who have not received shots and are fueling the spread of the virus. "We've been patient, but our

patience is wearing thin, and your refusal has cost all of us." *Id.*

106)    Yet as early as August 2021, it was public knowledge that while the vaccine worked to prevent severe illness and death, it did "not prevent transmission" of the disease, particularly as it related to the Delta variant, which comprised 93% of all cases at the time. Holcombe and Maxouris, *CDC head says COVID-19 vaccines prevent severe illness and death, but they can't prevent transmission*, CNN.COM, (August 16, 2021), at https://www.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-06-21/h_61de1502e86060f5faf4477339928e33. *See also*, Singanayagam, Ankia, PhD, et al., *Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study,* THE LANCET INFECTIOUS DISEASES, October 29, 2021, https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext. (British study finding that "fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings, including to fully vaccinated contacts").

107)    Given that the vaccine did not protect co-workers from spread of the disease, the rationale for the vaccine mandate was unfounded at best and knowingly false at worst. However, it underpinned the decisions and actions of Defendants for the next year and a half.

108)    Even before President Biden's vaccine mandate on September 9, 2021, Under Secretary of Defense Cisneros issued a memorandum to DoD leadership announcing guidelines for DoD civilian personnel in responding to Covid-19. Memorandum from Office of the Under Secretary of Defense to Chief Management Officer of the Department of Defense, *et al.*, *Civilian Personnel Guidance for DoD Components in Responding to Coronavirus Disease 2019*, March

8, 2020.

109)    This document outlined, among other things, early guidelines for leaders of DoD

civilian employees to follow during the pandemic. *Id*. It covered topics such as teleworking,

alternative work schedules, use of various types of leave due to illness, and guidance on safety

and hygiene best practices. This memo applied to all DoD civilian employees and established

that the Department was the policymaker and enforcer for all things COVID-19 as it applied to

its civilian employees.

> As provided in reference (a) at Attachment 1, the Department of Defense (DoD)
> has outlined a specific risk-based framework to guide planning, posture, and
> actions needed to protect DoD personnel and support mission assurance in
> response to the novel coronavirus disease (COVID-19).

110)    The memo explains:

> In support of these efforts, the attached civilian workforce guidance identifies
> authorities and best practices to help the Department minimize risk to its civilian
> personnel and their families, as well as to ensure the readiness of our force to
> continue to execute our missions and support our domestic and international
> partners. DoD Component heads *must take the steps outlined in Attachment 2 to
> ensure continuity of operations, assess readiness for effective telework, and
> communicate to the workforce good health and hygiene habits in the workplace . .
> .* Component heads should ensure this guidance is clearly communicated to all
> echelons throughout your respective organizations.

*Id.* Emphasis added.

111)    In ordering DoD leadership throughout the Department to follow the "steps" it

outlined in its memo, the Department set the stage for its implementation of discriminatory

practices that pitted employees with religious objections to the vaccine against the government

employer to which they had pledged their allegiance.

112)    On August 24, 2021, the Secretary of Defense directed the mandatory vaccination

of Service members against COVID-19. Memorandum from U.S. Secretary of Defense, Gilbert

Cisneros to Senior Pentagon Leadership, Commanders of the COMBATANT Commands,

Defense Agency and DOD Field Activity Directors, August 24, 2021, *Mandatory Corona virus Disease 2019 Vaccination of Department of Defense Service Members* ("After careful consultation with medical experts and military leadership, and with the support of the President, I have determined that mandatory vaccination against coronavirus disease 2019 (COVID-19) is necessary to protect the Force and defend the American people).

113)    President Biden issued EO 14043 two weeks later on September 9, 2021.

114)    Defendant Deputy Secretary of Defense officially rolled out President Biden's vaccine mandate to leadership of all civilian employees on October 1, 2021. Memorandum from Deputy Secretary of Defense Kathleen Hicks to Senior Pentagon Leadership, Commanders of the Combatant Commands Defense Agency and DoD Field Activity Directors, *Mandatory Corona virus Disease 2019 Vaccination of DoD Civilian Employees*, October 1, 2021.

115)    In that memorandum, Deputy Secretary of Defense Hicks noted that, "All DoD civilian employees must be fully vaccinated by November 22, 2021, subject to exemptions as required by law." She further noted that "[a]dditional guidance, including procedures for processing vaccination exemption requests, will be published by the Under Secretary of Defense for Personnel and Readiness (USD (P&R)). The USD (P&R) is authorized to rescind this memorandum as necessary for purposes of providing updated guidance."

116)    Deputy Secretary of Defense Hick's order was published to all civilian employees on October 4, 2021.

> All DoD civilian employees must be fully vaccinated by November 22, 2021, subject to exemptions as required by law. Employees are considered fully vaccinated 2 weeks after completing the second dose of a two-dose COVID-19 vaccine or 2 weeks after receiving a single dose of a one-dose COVID-19 vaccine . . . To meet this requirement, individuals must be vaccinated with vaccines that are either fully licensed or authorized for emergency use by the Food and Drug Administration (FDA) (e.g., Comirnaty/Pfizer-BioNTech, Moderna, Johnson & Johnson/Janssen); listed for emergency use on the World Health Organization

Emergency Use Listing (e.g., AstraZeneca/Oxford); or approved for use in a
clinical trial vaccine for which vaccine efficacy has been independently confirmed
(e.g., Novavax). Those with previous COVID-19 infection(s) or previous serology
are not considered fully vaccinated on that basis for the purposes of this mandate.

U.S. Department of Defense, *Mandatory Coronavirus Disease 2019 Vaccination of DoD
Civilian Employees*, October 4, 2021,
https://www.defense.gov/News/Releases/Release/Article/2799045/Mandatory-
Coronavirus-Disease-2019-Vaccination-of-DoD-Civilian-Employees/

117)    The guidance further required that employees attest to their vaccination status.

("Employees, including those who have already received COVID-19 vaccines, must be prepared

to provide a copy of their COVID-19 vaccine record in order to meet forthcoming procedures for

DoD COVID-19 vaccination verification."). *Id.*

118)    Per Deputy Secretary of Defense Hick's order, Under Secretary of Defense for

Personnel and Readiness (Cisneros) published additional, more comprehensive guidance on

October 18, 2021, that set forth the detailed policies that Plaintiffs would be subject to, including

policies that would NOT apply to certain DoD employees and contractors. Memorandum from

Under Secretary of Defense to Senior Pentagon Leadership et al., *Force Health Protection

Guidance (Supplement 23) Revision 1- Department of Defense Guidance for Coronavirus

Disease 2019 Vaccination Attestation, Screening Testing, and Vaccination Verification,* October

18, 2021 ("Force Health Protection Guidance Rev. 1" or "FHP Guidance Rev 1").

119)    The Guidance outlined DoD's policies regarding its vaccine and attestation

requirements, testing, masking and distancing protocols, enforcement mechanisms, and requests

for religious and medical exemptions.[4] *Id.*

---

[4] The FHG policy had been and continued to be updated until it was consolidated with other policy memoranda into
a single policy document.  "The Department began publishing FHP guidance and policy to address COVID-19 in
January 2020. In February 2021, the Secretary of Defense directed the review of all guidance and policy memoranda
previously issued for COVID-19. The review was completed in April 2021, and subsequent updates align DoD
COVID-19 policy and guidance with current Task Force, OMB, CDC, and OSHA guidance as appropriate."  See,

120)    The Guidance made clear that employees with religious objections to the vaccine would be required to undergo frequent and burdensome testing, masking, and distancing protocols, which in many cases, also violated Plaintiffs' religious beliefs.

121)    In establishing the enforcement procedure that leaders of DoD civilian employees were to follow, the Guidance stated:

> DoD civilian employees who refuse to be vaccinated, or to provide proof of vaccination, are subject to disciplinary measures, up to and including removal from Federal service, unless the DoD civilian employee has received an exemption or the DoD civilian employee's timely request for an exemption is pending a decision . . .

*Id.*

Progressive enforcement actions include, but are not limited, to

- A 5-day period of counseling and education;
- A short suspension without pay, of 14 days or less, with an appropriate notice period. Senior Executive Service members may only be suspended for more than 14 days;
- Removal from Federal service for failing to follow a direct order.

*Id.*

122)    The Guidance further stated that "Exemptions will be granted in limited circumstances only where legally required," and that more guidance would be coming. Under Secretary Cisneros directed leaders at that time to "take no action on any exemption requests received from DoD civilian employees. *Id.*

123)    Upon information and belief, the Department did not grant a single religious exemption to the vaccine, yet it granted hundreds of other exemptions for medical waivers.

124)    For example, DODEA provided numerous medical accommodations to

---

Memorandum from Under Secretary of Defense to Senior Leadership, et al.*, Consolidated Department of Defense Coronavirus Disease, Force Health Protection Guidance*, April 4, 2022.

employees in the 2020-2021 school year, yet it did not provide any religious exemptions.

Religious Exemption Process

125)    The FHP Guidance was updated on December 20, 2021, to include specific details about how religious (and medical) exemptions would be processed. DoD FHP Guidance allowed employees to request an exemption from the vaccine mandate "on the basis of a medical condition or circumstance or a sincerely held religious belief or practice."

126)    Further, DoD did not follow its normal procedure allowing employees to request a religious accommodation to the vaccine. Instead, in the words of President Biden's own aids, to "render being unvaccinated so burdensome that those who haven't received shots will have little choice other than to get them," the Department set up a completely separate, and more burdensome, process for those with religious objections to the COVID-19 vaccine.[5]

127)    DoD announced its new process, which applied only to exemptions to the vaccine, in its FHP Guidance Rev. 3 on December 20, 2021.

128)    DoD required its civilian employees to fill out a newly created DD Form 3177 for religious exemptions.

129)    DoD announced the purpose of the form and its authority to make determinations about religious accommodations to the vaccine mandate:

> **Principal Purpose**: the information on this form is being collected *so that the DoD may determine whether to grant your request for a religious exemption* to the COVID-19 vaccination requirement for federal employees pursuant to Executive Order 14043 and in furtherance of COVID-19 workplace safety plans. Consistent with the Religious Freedom Restoration Act of 1993, 32 U.S.C., Chapter 21B, and Title VII of the Civil Rights Act, 42 U.S.C. Chapter 21 Subchapter VI, individuals seeking a religious exemption from the vaccine

---

[5] Maegan Vasquez, *Biden announces measures to incentivize COVID-19 vaccinations, including a requirement for federal employees*, CNN.com, (July 29, 2021), available at: https://www.cnn.com/2021/07/29/politics/joe-biden-vaccination-requirement-announcement/index.html.

requirement will submit to DoD supporting information about their religious beliefs and practices in order for DoD to evaluate the exemption request.

130)    The new Form DD 3177 added multiple questions to the standard religious accommodation form, which employees were required to answer. These questions inquired more deeply into employees' personal and private beliefs and actions and were more burdensome than the standard process. Questions on the form required employees to disclose deeply private and personal information about their religious faith, as well as about other medical conditions, medications, and vaccines they may or may not have taken in the past.

131)    Form 3177 made clear that DoD would make the determination about whether to grant religious exemptions, however, it purported to such delegate decision authority.

Management official(s) will be designated to serve as Decision Authorities to make decisions concerning requests for exemption from the COVID-19 vaccination requirement, in consultation with the organization's servicing legal office. Decision Authorities will be at an appropriate level within the organization to consider the impact, if any, that granting a request will have on the DoD Component operations and to promote similar cases being handled in a consistent manner, with due regard for the facts and circumstances of each case. Each employee's request must be considered on its own merits.

132)    It also specifically directed the Decision Authority on how to adjudicate such requests.

In the first instance, Decision Authorities are to determine whether the requestor has met his or her burden to establish that the vaccination requirement imposes a substantial burden on exercise of a sincerely held religious belief. If so, Decision Authorities analyze the request to determine whether the burden on religious exercise is the least restrictive means of furthering the Government's compelling interest in health and safety of the DoD workforce, and the health and safety of members of the public with whom they interact. If vaccination is not the least restrictive means, the exemption will be granted and supervisors will implement the less restrictive means.

133)    Yet, as became evident throughout the events giving rise to these claims, DoD did not allow its leaders to take any action on exemption requests, either in October 2021, at the time

the original guidance was published, or any time after that. Rather, Plaintiffs were left completely in the dark about when and whether their exemptions would be processed and whether they would be subject to discipline or termination because of their religious beliefs against the vaccine, until the President finally and officially rescinded the vaccine mandate on May 23, 2023.

134) Defendants never provided any definitive communication to Plaintiffs about the final status of their exemption requests.

135) Indeed, DoD paused the vaccine mandate on January 25, 2022, but never told Plaintiffs whether the pause was a final disposition, whether they could still lose their jobs for failing to take the vaccine, or whether they could live safely out from under the looming oppression of a threat that would require them to choose between their faith or their jobs.

136) For example, Ms. Stadler sent an email to the new vaccination exemption mailbox asking for an update on her vaccine exemption request, which she had filed over two months earlier on November 6, 2021. Her email stated:

> I am writing to see if there is an update on the progress of the exemptions that have been submitted. Many are left in this discriminatory situation with zero information on what has been occurring. An update would be much appreciated.

137) The newly created Vaccination Exemption Request Process Team responded, saying, "Unfortunately, no updates are available with respect to specific cases. Please be assured that the Vaccination Exemption Process Team is working the submitted exemption requests."

138) Yet there was no evidence the Vaccination Exemption Process Team, the DoD or any one else was ever "working the submitted exemption requests."

<u>Testing / Screening Process</u>

139) During the pendency of their religious exemption requests, most Plaintiffs were

forced to follow protocols of testing, masking, and distancing. Ms. Stadler and Ms. Arzamendi each all filed religious accommodation requests to avoid the invasive testing protocols– and each was denied outright.

140)    They did not use DD Form 3177 to request an accommodation, as that form was for vaccine exemptions only. They used the standard process for requesting a religious accommodation.

141)    Notably, while civilian employees were required to show proof of a negative COVID-19 testing prior to entering any DoD facilities, the vaccination and physical access requirements did not apply to personnel receiving *ad hoc* access to DoD facilities, (such as delivery personnel), people with access to the grounds, but not the buildings, "personnel accessing DoD buildings unrelated to the performance of DoD business," or to "personnel accessing DoD facilities to receive a public benefit (e.g., commissary; exchange; public museum, . . .)."

142)    These exceptions to the testing protocols demonstrate the arbitrary nature of the procedures and belie the notion that they were necessary for the protection of all workers.

143)    Likewise, employees with pending religious exemptions were subject to travel restrictions for work-related events, training and development activities, which employees without such religious exemption requests were not subject to.

144)    For example, because of his religious objections to the vaccine, Mr. Orloff was denied travel to work sites even though as an acquisition officer and program manager, work travel was 25% of his job. He was prohibited from being co-located with his clients and his team and from attending critical training conferences which inhibited his ability to grow and develop professionally.

145)     When his clients and co-workers questioned his absence, Mr. Orlof was caught having to explain why he was not on site—revealing that he was not permitted to travel because of his religious beliefs against the vaccine.

146)     Plaintiffs who did not follow the testing protocols were also punished as promised. Ms. Stadler was placed on a leave of absence when she politely declined to engage in the testing procedures after her testing accommodation request was denied. Indeed, as she feared from the beginning, she was forced to choose between her religion and her livelihood. She ultimately chose her religion and resigned under duress effective June 1, 2022.

147)     These and other inconsistencies in application underscore the arbitrary nature of the vaccine mandate and related restrictions and protocols.

148)     Moreover, the mandates were illogical because employees who were vaccinated and did not share Plaintiffs' religious objections were also known carriers and transmitters of COVID-19, yet were not required engage in testing and related protocols.

149)     Indeed, in Ms. Stadler's own school, in which she was prevented from teaching because of her religious beliefs, 12% of staff (all vaccinated employees) contracted COVID during the 2021-2022 school year.

150)     This data flies in the face of the argument that such measures were mere safety precautions, in place to "protect vaccinated workers from unvaccinated workers."

151)     Religious believers were subject to different, illogical protocols that others did not have to endure. There was no true effort to understand Plaintiffs' religious beliefs, to engage them in dialogue to see how their beliefs could be accommodated or to ensure uniformity, consistency and even rationality in the application of their policies. The result was a complete and utter failure to accommodate Plaintiffs' religious beliefs, leaving Plaintiffs fearful for their

livelihoods and their futures.

Perceived Disability

152)     Defendants' actions also demonstrate that DoD imposed these onerous restrictions and protocols because they perceived Plaintiffs as disabled – as disease-spreaders who were not safe to be around and who could infect other employees at any moment.

153)     For example, Mr. Orloff's supervisors believed (or treated him as if they believed) he could or would transmit COVID-19 at any moment, despite having no evidence of being sick, having symptoms or being exposed to the disease.

154)     Mr. Orloff (and all Plaintiffs) was not allowed to come into the office without showing a negative COVID-19 test within 72 hours of entry, and he was prohibited from traveling for his job. If he came into the office during a "medium community threat level," he was required to mask and social distance, yet employees who did not share his religious beliefs did not.

155)     These facts demonstrate that Defendants treated Plaintiffs as disabled; lethal disease spreaders. There was in fact, no evidence Mr. Orloff or other Plaintiffs presented more risk than any other vaccinated employees.

Temporary Vaccine Rescission

156)     On January 21, 2022, a federal district court issued an injunction against EO 14043 (which was later upheld by the full *en banc* Fifth Circuit Court of Appeals in *Feds for Medical Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023)).[6]

157)     DoD suspended its vaccine mandate for the time being but continued implementing its testing / screening protocols.

---

[6] Defendants in that case recently petitioned the United Stated Supreme Court of the United States for a Writ of Certiorari.

158)    Indeed, testing protocols remained in effect for another full year later, until January 30, 2023.

159)    Finally, on May 12, 2023, President Biden rescinded E.O. 14043, thereby revoking the government-wide COVID-19 vaccine mandate for federal employees.

160)    For Plaintiffs who were still employed by DoD, this was the first time in years that they could breathe easy and fully accept that they would not have to lose their livelihoods just to honor and be faithful to their religious beliefs.

161)    While this was the right action, particularly given Fifth Circuit Court of Appeal's decision in *Feds for Medical Freedom,* after almost two years, this recission is too little too late. The harm has been done and it still continues.

Putative Class Agent's Complaint

162)    Mr. Orloff filed an individual formal complaint of discrimination and on or about April 18, 2022, and moved to certify a class action based on the same claims.

163)    All Plaintiffs, including named plaintiffs, were a party to the class charge, with Mr. Orloff as a class agent.

164)    Mr. Orloff received a notice of right to sue letter from the EEOC, Washington Field Office, on April 25, 2023, and has therefore exhausted administrative remedies for himself and the class.

**CLASS ALLEGATIONS**

165)    Certification of a class is appropriate in this action, with Plaintiffs Amy Arzamendi, Michael Orloff, and Brooke Stadler as representative class agents.

166)    The proposed class consists of all civilian employees who worked for DoD during the pandemic who filed a religious exemption request to the vaccine and were denied.

167)    Federal Rule of Civil Procedure 23(a) provides four criteria for courts to determine whether class certification is appropriate:

i)      The class is numerous that joinder of all members is impracticable;
ii)     there are questions of law or fact common to the class;
iii)    the claims or defenses of the representative parties are typical of the claims or defenses of the class;
iv)     and the representative parties will fairly and adequately protect the interests of the class.

168)    Here, Plaintiffs meet all four criteria.

169)    The Fifth Circuit has also articulated an "ascertainability" requirement for Rule 23 class actions, which Plaintiffs meet as well. *Braidwood Mgmt. v. EEOC*, 2023 U.S. App. LEXIS 15378, *33-34.

## ASCERTAINABILITY

170)    "The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *John v. Nat'l Sec. Fire & Cas. Co*., 501 F.3d 443, 445 (5th Cir. 2007).

171)    "[T]o maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam).

172)    Courts traditionally refuse to certify classes that are "amorphous" or "imprecise." *John*, 501 F.3d at 445, n.3.

173)    Here, DoD can readily identify all civilian employees who filed a religious exemption request to the vaccine during the period of September 1, 2021 (two months before the DoD submission deadline of November 15, 2022), to the date the vaccine mandate was rescinded (May 23, 2023). This expanded timeframe would include employees who joined DoD after November 15, 2021, and who filed religious exemption requests upon hire.

31

174) DoD likewise has data showing any religious exemptions that it granted, as well as any religious accommodations it denied.

175) All civilian employees were required to fill out Form 3177 (or provide their own form to include the same content), and upon information and belief not a single one was ever adjudicated.

176) Accordingly, upon information and belief, the putative class is easily ascertainable through discovery.

<u>NUMEROSITY</u>

177) The Fifth Circuit has held that:

[C]ertification is only appropriate where the class is so numerous that joinder of all members is impracticable. A plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members. This court, however, has repeatedly noted that the number of members in a proposed class is not determinative of whether joinder is impracticable. Rather, a number of facts other than the actual or estimated number of purported class members may be relevant to the numerosity question; these include, for example, the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim.

*Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2019) (citations omitted).

178) Here, the class includes 33 identified members, with the possibility of thousands more.

179) A certified class in this case would include all DoD civilian employees who requested a religious accommodation to the vaccination requirement and did not receive one. The DoD is the largest employer in the world, employing over 3.5 million people, including approximately 950,000 civilian employees.[7]

---

[7] DODCivilianCareers.com, *Why Work for DoD*, at
https://www.dodciviliancareers.com/whyworkfordod#:~:text=The%20Department%20of%20Defense%20(DOD,a%

180)    According to the White House, the federal workforce at large has achieved a 98% vaccination rate.[8]

181)    Assuming this statistic holds true for DoD, 19,000 employees remain unvaccinated. Even if only 10% of those employees remained unvaccinated for religious reasons and decided to seek redress, the class would be 1900 employees.

182)    And if 50% of those employees remain so for religious reasons, the class is at least as large as 9500 employees.

183)    These assumptions evidence the massive numbers of employees whose rights were violated when DoD did not accommodate their religious faith.

184)    Plaintiffs seek discovery to identify the full scope of the potential class in this matter.

185)    The members of the class are ascertainable and are sufficiently numerous that joinder of all members is impracticable.

<u>COMMONALITY</u>

186)    The standard for commonality is not high. Rather, it merely requires that "the resolution of common questions affect all or a substantial number of the class members." *Newby v. Enron Corp.* (*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*), 2004 U.S. Dist. LEXIS 8158, *99 (5th Cir. 2004)

187)    However, the Fifth Circuit "polices the definition of class actions" carefully, "to

---

20diverse%20range%20of%20skills.

[8] Executive Order 14,099, 88 FR 30891, (May 9, 2023)["Following issuance of those orders, my Administration successfully implemented a vaccination requirement for the Federal Government, the largest employer in the Nation, achieving a 98 percent compliance rate (reflecting employees who had received at least one dose of the COVID–19 vaccine or had a pending or approved exemption or extension request) by January 2022.]

avoid the doors to class action lawsuits [being] thrown open too wide." *Braidwood Mgmt. v. EEOC*, 2023 U.S. App. LEXIS 15378 *37 (5th Circuit June 20, 2023).

188)     Accordingly, it holds that "Commonality is satisfied only if the class members' claims depend upon 'a common contention' such that the 'determination of its truth or falsity will resolve an issue . . . central to the validity of each one of the claims in one stroke." *Id.*

189)     The "common contention" here is whether all Plaintiffs filed a religious exemption request to the vaccine (as Plaintiffs did), and whether DoD failed to accommodate those requests. This issue is "central to the validity of each one of the claims in one stroke." *Id.*

190)     Moreover, all that is required for each class is that there is one common question of law or fact: "The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.'" *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001) (citations omitted). Therefore, the fact that some of the Plaintiffs may have different claims, or claims that may require some individualized analysis, is not fatal to commonality.

191)     Here, the ultimate common question of fact as to every putative class member is the DoD's implementation of the vaccine mandate and its process for accommodating religious believers who objected to it.

192)     The common question of law includes whether DoD failed to accommodate these religious believers.

193)     A second "central issue" is whether Defendants, as evidenced by the policies they implemented, perceived civilian employees who filed religious exemptions to the vaccine as disabled, thus requiring them to test, mask, social distance and even isolate.

194)    This issue is based on the same data set of civilian employees and again is easily ascertainable through discovery.

TYPICALITY

195)    Fifth Circuit case law on the question of typicality tends to treat the term according to its common meaning, with denials coming when the putative class agent will suffer from defenses that apply to him, but not the rest of the class. *See, e.g.*, *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984), *Garonzik v. Shearson Hayden Stone, Inc.*, 574 F.2d 1220, 1221 (5th Cir.1978), cert. denied, 439 U.S. 1072, 99 S. Ct. 844, 59 L. Ed. 2d 39 (1979).

196)    The typicality requirement "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Griffin v. GK Intelligent Sys.*, 196 F.R.D. 298, 301 (S.D.T.X. 2000).

197)    Plaintiffs Amy Arzamendi, Michael Orloff, and Brook Stadler's interests are completely aligned with the other members of the class. The policies that gave rise to DoD's failure to accommodate Name Plaintiffs' religious exemption requests and the harm they suffered, are the same as the others in the class, as the policies that gave rise to those harms were DoD-wide policies creating an approach that applied to all individuals who requested a religious accommodation to the vaccine requirement. Named Plaintiffs' experiences were the same experiences as other potential class members throughout the Department.

ADEQUACY OF REPRESENTATION

198)    In the Fifth Circuit, the adequacy of representation analysis "encompasses two separate inquiries: (1) the willingness and ability of the named plaintiff 'to take an active role in and control the litigation and to protect the interests of absentees;' and (2) 'the zeal and competence of the representative's counsel.'" *Guenther v. BP Ret. Accumulation Plan*, 2021 U.S.

Dist. LEXIS 63660, *21-22 (S.D.T.X. 2021) (citations omitted).

199)    For the first inquiry, the question is whether "the class representatives must possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation," even though class representatives "need not be legal scholars, and are entitled to work with, and rely upon, their counsel in pursuing their claims and navigating the complicated legal and factual issues associated with complex litigation." A class representative is considered adequate when he has "familiarity with the complaint and with the concept of a class action." *Id.* (citations omitted).

200)    The Named Plaintiffs meet these requirements. They were at all relevant times DoD employees who requested a religious accommodation that they never received and who experienced the discrimination that other class members experienced. They experienced the same policies, the same repercussions of these policies, and the same culture that other potential class members experienced. They furthermore have taken an active role in organizing the potential class members, obtaining their statements, making initial contact with counsel, and providing all necessary follow-up. They are in all ways adequate to represent the interests of the class contemplated here.

201)    As for the competence and zeal of counsel representing the putative class, counsel has extensive experience with employment-related class action claims and complex litigation in multiple contexts. In-house counsel at his firm assisting with the case has extensive employment experience at two of the nation's top employment firms and has worked on several class-action cases in that context. Counsel will provide more detail on this point in a forthcoming motion for class certification.

ADDITIONAL CONSIDERATIONS

202)    Rule 23 goes on in subsection (b) to require plaintiffs to identify additional justifications for class certification. Here, class certification is appropriate according to Rule 23 (b)(3).

203)    Here, as indicated in Rule 23(b)(3), "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

204)    Most of the Plaintiffs identified here have already proceeded together as a putative class through the administrative phase. Relief on behalf of one member of the putative class would necessarily apply to the entire class of individuals identified here and who have yet to be identified.

205)    The substantial similarity in experience and in harm mitigates any interest of the individual class members' need to prosecute these claims. To the extent the harms differed, they fall within definable categories that are easily manageable.

206)    A class action would be the superior method by which to adjudicate their claims because of the similarities of the experience of the individual members, who all experienced the same policies and the same culture within DoD.

<u>RELIEF ALLEGATIONS</u>

207)    Defendant's actions caused and continue to cause Plaintiffs and class members devastating harm.

208)    All DoD employees who filed religious exemptions to the vaccine lived in constant fear of being placed on AWOL status or losing their jobs and many made drastic changes in their finances, relationships or living arrangements.

209)    Many DoD employees were forced out of their jobs, lost their healthcare, lost their pensions, drained their retirements, lost their homes and in many cases had to uproot their families so that they could try to continue their professions in their chosen careers.

210)    Other DoD employees were threatened with or actually placed on administrative leave and / or were given poor performance reviews.

211)    Many were unable to effectively perform their jobs because they were not allowed to enter work facilities or meet with clients, and many were denied travel opportunities for training and development.

212)    Many employees succumbed to testing under duress against their religious beliefs for fear of discipline or losing their jobs,

213)    Many suffered physical and mental health effects and were forced to take leave and / or seek medical help due to the constant coercion to be vaccinated and the harassment created by being treated as disabled and a threat to others.

214)    Still others – who applied for religious exemptions and have avoided the more immediate and direct damages to their jobs or their health – had their privacy invaded by the imposition of the vaccine attestation and testing requirements, and the requirement that they unnecessarily disclose intimate and sensitive facts about their religious convictions and medical conditions.

215)    Plaintiffs and class members are entitled to compensation for losses in earnings, promotional opportunities and employment benefits, injury to reputation and emotional distress – in amounts to be determined at trial.

**COUNT I**
**VIOLATION OF TITLE VII 42 U.S.C. § 2000e, *et seq.***
**RELIGIOUS DISCRIMINATION: FAILURE TO ACCOMMODATE**

216)    Plaintiffs restate the foregoing paragraphs as set forth fully herein.

217)    Under Title VII, a plaintiff alleging religious discrimination based on a failure to accommodate:

> Must first set forth a *prima facie* case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement.

> *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014).

218)    Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer "[t]o demonstrate either that it reasonably accommodated the employee, or that it was unable to reasonably accommodate the employee's needs without undue hardship." *Id.* (quoting *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013)).

219)    The Supreme Court recently clarified that, "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." That inquiry it described as "fact specific." *Groff v. DeJoy*, 2023 U.S. LEXIS 2790, *28 (2023).

220)    The term "religion" includes:

> All aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

> 42 U.S.C. § 2000e(j).

221)    As the Supreme Court noted:

> The intent and effect of this definition was to make it an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees.

> *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 74 (1977) (emphasis added).

222)    A belief "can be religious even if it is not acceptable, logical, consistent, or comprehensible to others." *US. v. Zimmerman*, 514 F.3d 851 (9th Cir. 2007). Indeed, the Supreme Court has made clear the deference that is required in cases of religious freedom:

> Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual . . . because of such individual's" "religious observance and practice." […] when an applicant requires an accommodation as an "aspec[t] of religious . . . practice," it is no response that the subsequent "fail[ure] . . . to hire" was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775, 135 S. Ct. 2028, 2034 (2015).

223)    Plaintiffs hold sincere religious beliefs that conflict with Defendants' COVID-19 vaccine mandate and in some cases, its testing mandate. This fact of their faith is self-evident. Plaintiffs risked their careers (threat of job loss, humiliation, placement on administrative leave, loss of travel, training and career opportunities, etc.) to avoid the vaccine and protect their strongly held beliefs. *Res ipsa loquitur*.

224)    Plaintiffs informed Defendants that their sincerely held religious beliefs conflicted with Defendants' COVID-19 vaccine mandate and requested religious exemptions outlining those beliefs.

225)    Defendants discharged, threatened, suspended, tested, or otherwise subjected Plaintiffs to adverse employment actions because their faith precluded them from taking the vaccine.

226)    Defendants repeatedly threatened Plaintiffs in writing with discipline, administrative leave, and removal from the Department if they failed to be vaccinated without an approved accommodation.

227)    If Defendants had processed Plaintiffs' requests for an exemption to the vaccination in any meaningful way, none of these harms would have occurred.

228)    Plaintiffs who refused to test based on their religious beliefs were placed on administrative leave, were constructively discharged, or were outright terminated.

229)    Plaintiffs who were put on administrative leave or AWOL had notices placed in their personnel files that would remain and permanently and would impact future career opportunities.

230)    Defendants failed entirely to engage in any interactive process with Plaintiffs.

231)    Moreover, the statutory framework for determining reasonable accommodation requires an interactive process and participation by both the employer and the employee. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (stating that, consistent with the goals expressed in the legislative history of the religious accommodation provision, "courts have noted that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business") *Id., see also Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141 (5th Cir. 1982)

232)    "Once an employee makes [an accommodation] request, the employer is obligated by law to engage in an interactive process – a meaningful dialogue." *Equal Emp. Opportunity Comm'n v. Chevron Phillips Chem. Co*., 570 F.3d 606, 621 (5th Cir. 2009) (in the context of a disability).

233)    Defendants neither requested nor proposed that Plaintiffs participate in any discussion to determine fair and legal accommodations for their religious beliefs. They did not follow up with Plaintiffs to ask questions or make requests for clarifications and they did not make any effort pursue an "acceptable reconciliation for both parties." *Ansonia Bd. of Educ.*, 479

U.S. at 69.

234)    When Plaintiffs requested updates, none were available.

235)     Rather, Defendants let Plaintiffs linger in fear and anxiety for months on end without certainty about their future, their livelihoods, and even their retirement prospects.

236)    Unlike the requests for accommodations to the vaccine, Defendants did act on Plaintiffs' requests to be exempt from the testing mandate, but upon information and belief, in every case, their requests were denied.

237)    Defendants acted quickly in denying the testing exemption requests; they did not engage in any meaningful dialogue with Plaintiffs and in many cases when the denials were handed down, they moved immediately to remove Plaintiffs from DoD property and/ or suspend them.

238)    Defendants' undue delay in creating a process and responding to Plaintiff' requests for exemption from the vaccine was also unlawful. In the context of a Title VII religious discrimination claim, "'a week-to-week, wait-and-see posture' amounts to no accommodation at all." *EEOC v. Robert Bosch Corp*., 169 F. App'x 942, 945 (6th Cir. 2006) (*citing EEOC v. Arlington Transit Mix, Inc*., 957 F.2d 219, 222 (6th Cir. 1991).

239)    Courts have found both delay and denial of religious accommodation are deemed an "injury" in and of themselves. *Doster v. Kendall*, No. 1:22-cv-84, 2022 U.S. Dist. LEXIS 125400, at *10-13 (S.D. Ohio July 14, 2022) (in the context of a Religious Freedom Restoration Act / First Amendment case). See also, *Matos v. Devos*, 317 F. Supp. 3d 489 (D.D.C. 2018) (finding that the delay in providing an accommodation amounts to a failure to accommodate in the ADA context).

240)    Indeed, "an accommodation is not reasonable if [the employer] only provided

Plaintiffs with an opportunity to delay their eventual termination." *Tabura v. Kellogg USA*, 880 F.3d 544, 550 (10th Cir. 2018) (holding that the principle of delay-as-discrimination translates into the context of religious accommodation under Title VII).

241)    Even when the temporary injunction against the vaccine mandate was in effect, effectively pausing enforcement, the lack of transparency and information caused constant anguish for Plaintiffs who knew they could still be terminated if their exceptions were not ultimately granted.

242)    The stress of knowing that these difficulties could drop back into their lives at any moment has hovered over these individuals, causing undue stress, creating new health conditions, and often exacerbating preexisting health conditions.

243)    Their fear was justified, as the injunction proceeded through the court system, and may yet proceed to the Supreme Court of the United States.

244)    Ultimately Plaintiffs waited close to two years to get closure, which came not from Defendants but from Office of the President when he rescinded EO 14043.

245)    Defendants did not (and could not) show Plaintiffs that accommodating their religious beliefs would create an undue hardship—a "burden that is substantial in the overall context of [its] business." *Groff v. DeJoy*, 2023 U.S. LEXIS 2790, *28.

246)    This is demonstrated by their own policies: Defendants did not require several other classes of workers to get the vaccine or engage in attestations or testing protocols. Delivery personnel, grounds keepers, public visitors to the commissary, exchange or public museums and "personnel accessing DoD buildings unrelated to the performance of DoD business" were all exempt from the vaccination and physical access requirements.

247)    Defendants did not deny vaccine exemptions to at least hundreds of employees

43

who filed medical exemptions to the vaccine.[9]

248)    Defendants' blanket policy of inaction on Plaintiffs' accommodation requests was improper and illegal. They could have offered Plaintiff several reasonable accommodations without encountering an undue hardship, including protocols that were in place before the availability of the vaccine, such as remote work.

249)    Defendants ignored their obligation to engage in individualized assessments of each Plaintiffs' situation and instead applied a single policy leaving Plaintiffs without any sense of peace or comfort that the government had their best interests at heart or that it was making any attempt to protect their religious beliefs. Such inaction flies in the face of Defendant's obligation to act with "favored treatment" toward Plaintiffs' religious beliefs. *Abercrombie & Fitch Stores, Inc.*, 575 U.S. at 775.

250)    As the Fifth Circuit Court of Appeals has held:

> Forcing individuals to choose between their faith and their livelihood imposes an obvious and substantial burden on religion . . . vaccine mandates . . . present a crisis of conscience for many people of faith. It forces them to choose between the two most profound obligations they will ever assume – holding true to their religious commitments and feeding and housing their children. To many, this is the most horrifying of Hobson's choices.

*Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 841.

251)    Class members have clearly made out a prima facie case of failure to accommodate, which needs to be redressed.

**COUNT II**
**VIOLATION OF TITLE VII 42 U.S.C. § 2000e, *et seq.***
**RELIGIOUS DISCRIMINATION: DISPARATE TREATMENT**

---

[9] *See e.g.,* Complaint in *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, (5th Cir., 2022) ("The Navy has granted hundreds of medical exemptions from the vaccination requirements. But it has not accommodated any religious objections to the vaccine . . . ).

252)     Plaintiff restates the foregoing paragraphs as set forth fully herein.

253)     The Civil Rights Act of 1964 states in relevant part:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, **religion**, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, **religion**, sex, or national origin.

254)     To assert a successful claim of religious discrimination

A plaintiff must either present direct evidence of discrimination, or, in the absence of direct evidence, present a prima facie case of indirect discrimination by showing (1) that he was a member of a protected class, (2) that he experienced an adverse employment action (3) that he was qualified for the position, and (4) that similarly-situated employees outside the protected class received more favorable treatment.

*Rayyan v. Va. DOT*, 719 Fed. Appx. 198 (4th Cir. 2018); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

255)     In a class action disparate treatment case, Plaintiff must also assert Defendant

engaged in a pattern or practice of discrimination. *Munoz v. Orr*, 200 F.3d 291 (5th Cir. 2000).

256)     Named Plaintiffs and putative class members sincerely held religious beliefs

described herein qualify them as members of the protected class based on their bona fide

religious beliefs.

257)     An individual's testimony about his or her belief "must be given great weight"

and is enough to show he has a bona fide religious belief. *See, e.g.*, *United States v. Seeger*, 380

U.S. 163, 184 (1965) (when dealing "with the beliefs of different individuals who will articulate

them in a multitude of ways . . . the claim of the [party] that his [or her] belief is an essential part of a religious faith must be given great weight.").

258)    As long as a party's beliefs are religiously based, it is not for the courts to inquire whether those beliefs derived from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible. *Hobbie v. Unemployment Comm'n of Fla*., 480 U.S. 136, 144 n. 9, (1987). Thus, "Courts may not engage in an extensive inquiry into the religious beliefs of the plaintiff in order to determine whether religion mandates the employee's adherence. It is no business of courts to say what is a religious practice or activity." *Heller v. EBB Auto Co*., 8 F.3d 1433, 1439 (9th Cir. 1993*), citing Fowler v. State of R.I*., 345 U.S. 67, 73 (1953).

259)    Named Plaintiffs and putative class members were all subject to at least one adverse action that was common among the putative class: DoD's pattern and practice of requiring every civilian employee to be vaccinated and then failing to accommodate those who filed religious exemption requests. These actions caused religious believers significant harm.

260)    Plaintiffs lived under constant coercion and fear that if they failed to conform to the secular mindset of embracing the vaccine or testing protocols, they would be disciplined and/or terminated, putting their livelihoods, their futures and the futures of their families at risk.

261)    That coercion is harmful in and of itself. *See Sambrano v. United Airlines, Inc*., No. 21-11159, 2022 U.S. App. LEXIS 4347, 12 (5th Cir. 2022) (holding that plaintiffs who were subject to the vaccine mandate were "subjected to ongoing coercion based on their religious beliefs. That coercion is harmful in and of itself . . .") (*citing BST Holdings, L.L.C. vs. OSHA*, 17 F. 4th 604, 618 (5th Cir. 2021) (holding that Plaintiffs had suffered irreparable harm from being coerced into "a choice between their job(s) and their jab(s)"); *Feds for Med. Freedom v. Biden*

2023 U.S. App LEXIS 7018, 43 (5th Cir. 2023) ("[w]hen a regulation is directed at [plaintiffs] in particular and requires them to make significant changes, plaintiffs have suffered an injury to challenge the order even if the Government has yet to elucidate the precise consequences of failing to comply. . . Plaintiffs do not have to identify exactly how the Government will enforce the mandate; it's enough that plaintiffs face the ominous order, "get vaccinated or else" (internal citations omitted)).

262)    Plaintiffs were each qualified for their position.

263)    Employees who did not file religious exemptions to the vaccine mandate were not subject to intense coercion based on their religious beliefs and were therefore treated "more favorably" that those in the protected class.

264)    Indeed, while religious employees who requested vaccine exemptions were required to show proof of a negative COVID-19 testing prior to entering any DoD facilities, the vaccination and physical access requirements did not apply to personnel receiving *ad ho*c access to DoD facilities, (such as delivery personnel), people with access to the grounds, but not the buildings, "personnel accessing DoD buildings unrelated to the performance of DoD business," or to "personnel accessing DoD facilities to receive a public benefit (e.g., commissary; exchange; public museum, . . .)."

265)    Employees in those classes were subject to "more favorable" treatment than Plaintiffs.

266)    Named Plaintiffs and putative class members also experienced many other harms. They were placed on administrative leave, given letters of reprimand and constructively discharged or terminated; they were prevented from effectively doing their job by being prohibited from going to work, meeting with clients, and attending work events and training and

development opportunities.

267)    They also suffered "outing" experiences such as masking, testing, and forced absence from office-wide work gatherings. The testing itself was physically invasive and uncomfortable, while at the same time scientifically unjustified. And they were forced to use a different, intrusive, procedure for acquiring religious accommodations and ultimately, they received no accommodation at all.

268)    Employees who did not submit religious exemption requests suffered none of these harms.

269)    The Department fostered a pervasive environment of religious discrimination in violation of Title VII of the Civil Rights Act according to both disparate impact and disparate treatment theories of discrimination.

**COUNT III**
**VIOLATION OF TITLE VII 42 U.S.C. § 2000e, *et seq.***
**RELIGIOUS DISCRIMINATION:**
**HARASSMENT/ HOSTILE WORK ENVIRONMENT**

270)    Plaintiff restates the foregoing paragraphs as set forth fully herein.

271)    Under Title VII, employers also cannot "Harass an employee because of race, color, religion, sex (including sexual orientation and gender identity), or national origin," Laws We Enforce by United States Department of Justice, https://www.justice.gov/crt/laws-we-enforce (emphasis added).

272)    As the Supreme Court noted in Harris v. Forklift, 510 U.S. 17, 21 (1993). the language of Title VII "evinces a congressional intent to strike the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatory hostile or abusive environment," (citing Meritor Savings Bank, FSB v. Vinson,

48

477 U.S. 57 at 64 (1986)). The injuries are "not limited to 'economic' or 'tangible' discrimination." Id.

273)    "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.*

274)    To succeed on a hostile work environment claim based on race, the plaintiff must demonstrate: "(1) that he was subjected to verbal or physical conduct of a [based on his protected class]; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).

275)    "Harassment is unwelcome conduct that is based on …religion…[and] becomes unlawful where 1) enduring the offensive conduct becomes a condition of continued employment, or 2) the conduct is so severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile or abusive." EEOC Guidance on Harassment. https://www.eeoc.gov/harassment.

276)    The conduct must create a work environment that would be intimidating, hostile or offensive to reasonable people. *Id.*

277)    "The employer is automatically liable for harassment by a supervisor that results in a negative employment action such as termination, failure to promote or hire, and loss of wages." Id.

278)    If the supervisor's harassment results in a hostile work environment, the employer can avoid liability only if he can prove that 1) he reasonably tried to prevent and promptly correct the harassing behavior, and 2) the employee unreasonable failed to take advantage of any

preventive or corrective opportunities provided by the employer. *Id.*

279)    Here, Defendants harassed Plaintiff by their illegal policies, and constant and coercive emails and memos directing them to comply with the mandate.

280)    Defendants' constant threats of discipline and/or termination for not following vaccine and testing protocols – all while Plaintiffs' religious exemption requests were still pending, created a coercive, heavy-handed environment was "intimidating, hostile and offensive" to religious believers. *Vasquez*, 349 F.3d at 642.

**COUNT IV**
**TITLE VII 42 U.S.C. §2000e,** *et seq.*
**RELIGIOUS DISCRIMINATION:**
**DISPARATE IMPACT**

281)    Plaintiff restates the foregoing paragraphs as set forth fully herein.

282)    Even if Defendants did not intend to discriminate against Plaintiffs based on their religious beliefs, the policy they implemented requiring vaccines of all employees had a disparate impact on employees with religious objections to the vaccine.

283)    Under the disparate-impact theory of Title VII:

A plaintiff establishes a prima facie violation by showing that an employer uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin. 42 U.S.C.S. § 2000e-2(k)(1)(A)(i).

An employer may defend against liability by demonstrating that the practice is job related for the position in question and consistent with business necessity. Even if the employer meets that burden, however, a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs. 42 U.S.C.S. § 2000e-2(k)(1)(A)(ii), (C). See also, *Ricci v. DeStefano*, 557 U.S. 557, 578, (2009).

284)    In this case, Defendants implemented a policy requiring COVID-19 vaccines for all employees.

285)    Yet that policy had a disparate impact on religious believers who opposed the vaccine, which was not job related and was not consistent with business necessity. [10]

286)    Alternative means were available to Defendants that would have had less disparate impact on religious believers and still served the Defendants' legitimate needs.

## COUNT V
## RELIGIOUS FREEDOM RESTORATION ACT
### 42 U.S.C. §2000bb *et seq.*

287)    Plaintiff restates the foregoing paragraphs as set forth fully herein.

288)    The Religious Freedom Restoration Act states in relevant part: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C.S. § 2000bb et seq.

289)    RFRA sets the standards binding every department of the United States to recognize and accommodate sincerely held religious beliefs, including in the military context. *U.S. Navy Seals 1-26 v. Biden,* 27 F.4th 336, (5th Cir., 2022).

290)    As the Supreme Court has noted, RFRA affords even "greater protection for religious exercise than is available under the First Amendment[]" and provides that the "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Navy Seals,* 27 F.4th at 347-358, 350, (5th Cir. 2022), *citing Holt v. Hobbs*, 574 U.S. 352, 357, 135 S. Ct. 853, 859-60, 190 L. Ed. 2d 747 (2015); 42 U.S.C. § 2000bb-1.

---

[10] Multiple studies have linked protestant Christianity and hesitancy over the vaccine mandate. *See, e.g.*, Jeanine P.D. Guidry, et al., *Between Healthcare Practitioners and Clergy: Evangelicals and COVID-19 Vaccine Hesitancy*, Int J Environ Res Public Health, (September, 2022).

291)    In *Navy Seals*, the Fifth Circuit addressed facts very similar to this case. There, the DoD and the Department of the Navy failed to approve a single religious accommodation to the vaccine mandate, but granted hundreds of medical accommodaitons. *Id.*

292)    The court found that the vaccine would "directly burden [Plaintiffs'] respective faiths by forcing them to inject an unremovable substance at odds with their most profound convictions. This injury would outlast their government service, making the decision whether to acquiesce far more difficult than just choosing between 'their job(s) and their jab(s)'. *Navy Seals*, 27 F.4th at 350 (*quoting, BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

293)    The "vaccine requirements principally compete against [Plaintiffs] faiths and secondarily against their livelihoods. . . These circumstances impose a substantial burden on Plaintiffs." *Id* at 350.

294)    Here, with respect to Named Plaintiffs and the putative class members, the Department has likewise burdened the exercise of religion by coercing religious believers to accept an invasive, experimental medical product into their bodies, one with known negative health impacts and no consensus yet on long term negative effects.

295)    Yet it did not burden at least some employees with secular (medical) objections to the vaccine.

296)    Indeed, as stated above, it allowed several classes of employees to be exempt from the vaccination requirement and the building access protocols.

297)    Coercing, shaming and threatening employees into taking the vaccine is no accommodation at all, much less one that is "the least restrictive means of furthering that compelling governmental interest." *Navy Seals*, 27 F.4th at 347-358, 350.

298)    Similarly, requiring testing, stigmatizing masking and distancing, and limiting

travel and professional opportunities because of Plaintiffs' disfavored religious beliefs, was also no accommodation.

299)     The least-restrictive-means standard is exceptionally demanding. When applying the least-restrictive-means standard, a defendant must show that it lacks other means of achieving its desired goal without imposing substantial burden on the exercise of religion by the objecting party. *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 709 (2014).

300)     Here, Defendants did not begin to meet this standard.

RFRA precludes Defendants from relying on broadly formulated interests such as 'national security' and 'stemming the spread of COVID-19' to overcome Plaintiffs' claims. *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 726-27 (2014). Rather, Defendants 'must articulate a compelling interest in vaccinating' the Plaintiffs before this Court. *Id.* Defendants have failed miserably to do so. Defendants provide no specific compelling interests in denying these Plaintiffs' specific religious exemptions while at the same time granting numerous medical and administrative exemptions.

*Doster v. Kendal*, U.S. Dist. LEXIS at *1016.

301)     Notably, *in Tanzin v. Tanvir*, 141 S. Ct. 486 (2020), the Supreme Court has found that the Religious Freedom Restoration Act allows plaintiffs to recover money damages against federal officials in their official capacities for violations.

**COUNT VI**
**REHABILITATION ACT; AMERICAN WITH DISABILITIES ACT**
**"REGARDED AS"**

302)     Plaintiff restates the foregoing paragraphs as set forth fully herein.

303)     Section 501 of the Rehabilitation Act of 1973 ("the Rehab Act" or Section 501"), as amended, 29 U.S.C. §791 et seq., and the American with Disabilities Act of 1990, (the "ADA"), the ADA Amendments of 2008 (the "ADAA"), and Final Rule Implementation (collectively referred to as "the Acts") preclude employers from discriminating against federal employees on the basis of an actual or perceived disability.

304)   The standards used to determine whether Section 501 has been violated shall be the standards applied under the ADA. 29 C.F.R. §1614.203(b).

305)   No employer shall discriminate against a qualified individual on the basis of disability. 42 U.S. code §12112(a).

306)   "The Federal Government shall be a model employer of individuals with disabilities." 29 C.F.R. §1614.203(c).

307)   The Americans with Disabilities Act defines the term "disability," with respect to an individual: (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(1)(A)(B)(C).

308)   "'Regarded as,' means that the person either: Has an impairment that does not substantially limit a major life activity; Has an impairment that substantially limits a major life activity only as a result of the attitudes of others toward them or; Does not have any impairment but is treated by an entity as having an impairment." National Networ*k*, *What does "regarded as" having a disability mean*?" https://adata.org/faq/what-does-regarded-having-disability-mean. *See also* 29 CFR §1630.2(l)(1), which states, "[A]n individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived mental or physical impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity."

309)   Physical or mental impairment means any physiological disorder or condition affecting one or more body systems. 29 C.F.R. §1630.2(h)(1).

310)   The ADAA clarified that an individual is "regarded as" having such an impairment if adverse action was taken due to an actual or perceived physical or mental

impairment, whether or not the impairment limits or is perceived to limit a major life activity"
and it shall not apply to impairments that are transitory and minor. 29 C.F.R. §1630.2(g)(1)(iii).

311)     Defendants treated employees who had religious objections to the vaccine as
disabled. Based on the illogical restrictions and testing screening protocols they placed on
Plaintiffs, it is clear they believed (or at least treated Plaintiffs as if they believed) Plaintiffs were
at all times at risk of spreading a deadly disease that could severely harm and/or kill employees.

312)     Defendants did not consider individual health factors, prior exposure to COVID-
19, natural immunity, or any other number of factors that could be helpful in determining
whether Plaintiffs presented undue risk.

313)     Rather, Defendants treated every single Plaintiff who was unvaccinated as if they
were disabled and were a direct threat to the Department. This conduct had the effect of shaming,
outing and discriminating against Plaintiffs. 29 C.F.R. 1630.2 (l)(1) (prohibited actions include
but are not limited to refusal to hire, demotion, placement on involuntary leave, termination,
exclusion for failure to meet a qualification standard, harassment, or denial of any other term,
condition, or privilege of employment).

314)     The Department, through its COVID-19 policies and mandates regarded and
classified Plaintiffs and the class members as a risk source based on their physiological condition
of being unvaccinated. The fact that the Department viewed them as a potential threat of being
infected or carrying COVID-19 shows that it regards the employees who are "unvaccinated" as
disabled.

315)     The ADA "provides that employment qualification standards may include a
requirement that an individual shall not pose a direct threat to the health or safety of other
individuals in the workplace." 42 U.S.C.S. § 12113(b). *Leblanc v. Honeywell Int'l, Inc*., 2021

U.S. Dist. LEXIS 231916, *1

316)    "The determination that an employee poses a 'direct threat' must be based on an individualized assessment of the employee's present ability to safely perform the essential functions of the job." 29 C.F.R. 1630.2(r).

317)    This the Department did not do.

318)    Rather, it made a sweeping assessment that anyone who filed a religious request for a vaccination exemption was a substantial danger to other employees and could not even be permitted at work, without arbitrary testing screening procedures.

319)    The Department engaged in prohibited conduct which violates 42 USC §12203(b) and 29 C.F.R. §1630.12(b). The Defendants harassed, intimidated, coerced and interfered with Plaintiffs' and class members' rights. The consequences include, but are not limited to, threats of, and actual discipline and termination, denial of travel and missed job opportunities, and the ability to perform essential functions of the job by attending work onsite and interacting with others in person.

## COUNT VII
## 1ST AMENDMENT TO THE UNITED STATES CONSTITUTION
## FREE EXERCISE CLAUSE

320)    Plaintiff restates the foregoing paragraphs as set forth fully herein.

321)    The Free Exercise Clause of the First Amendment of the United States Constitution ("Free Exercise Clause") applies when government action "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (citations omitted).

322)    Under the Free Exercise Clause, "if the object of a law is to infringe upon or

56

restrict practices because of their religious motivation, … it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." Id. at 533 (citations omitted). "Official action that targets religious conduct for distinctive treatment cannot be shielded by … facial neutrality," as "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt." Id. at 534.

323)    Here, the Defendants' vaccine mandate and the medical examinations and inquiries associated therewith violated the Free Exercise Clause. The Federal Government, including Defendants, purposefully enacted its vaccine mandate to infringe upon or restrict the practices of its employees who objected to receiving the vaccine because of their religious beliefs.

324)    The repeated communications from the Defendants pressuring and coercing employees to take the vaccine and the sham process by which employees could request exemptions shows discriminatory intent. Defendants also exhibited discriminatory intent in adopting the posture of the federal government and the President, which is to promote vaccination, no matter the expense to individual rights.

325)    Defendants' vaccine mandate was not justified by a compelling interest and Defendants failed to narrowly tailor its implementation of a vaccine mandate by ignoring the natural immunity of some Plaintiffs and by ignoring other less restrictive approaches. Defendants knew that both vaccinated employees and those who declined to be vaccinated could spread COVID-19 and had no scientific evidence that employees with natural immunity were more likely to spread COVID-19 than employees who had been vaccinated.

326)    It was public knowledge as early as August 2021 that while the vaccine helped reduce deaths and the severity of symptoms, it did not prevent the spread of COVID-19. To the

extent that the Defendants may have considered the "public health risk" posed by employees with religious objections to the vaccine, the Defendants were not entitled, in the face of religious opposition to the vaccines, to override an individual's choice to risk the possibility of worse symptoms, death, and hospitalization for themselves, especially since there was no scientific evidence that the vaccine prevented the spread of the disease or the severity of the disease in others. "Plaintiff's First Amendment freedoms are seriously infringed by the [Defendants'] vaccine requirements. *Navy Seals*, 27 F.4th at 353.

**COUNT VIII**
**5th AMENDMENT TO THE UNITED STATES CONSTITUTION**
**DUE PROCESS CLAUSE**

327)    Plaintiff restates the foregoing paragraphs as set forth fully herein.

328)    The Supreme Court has recognized that "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions." *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, (1990).

329)    The Court rooted this principle in the Due Process clause of the Fifth Amendment.

330)    This principle is what makes Defendants' conduct in this episode unlawful. It is using economic power to secure "consent" to an unwanted medical treatment. This is the same type of "consent" that harassers seek from the harassed in the sex discrimination context and should not be permitted.

**PRAYER FOR RELIEF**

331)    Plaintiffs respectfully request that the Court:

58

   a.   Hold unlawful and set aside the Defendant's discriminatory COVID-19

       vaccination and testing policies;

   b.   Award appropriate compensatory and punitive damages for injuries suffered;

   c.   Award reasonable attorneys' fees and allowable costs, including under the

       Equal Access to Justice Act;

   d.   Grant Plaintiffs such other and further relief to which they are justly entitled at

       law and in equity.

**JURY TRIAL**

A jury trial is requested in this matter.

Dated: July 24, 2023

By:

E. Scott Lloyd
Virginia Bar # 76989
Lloyd · Lemmon, PLLC
15 Chester St
Front Royal, VA 22630
(540) 631-4081
scott@lloydlg.com
*Attorney-in-charge*
*Counsel for Plaintiffs*
**pro hac vice* application pending

**Daniel W. Manning**
State Bar No. 24081018
Southern District State Bar No. 3098098
dmanning@bajb.com
*Local Counsel*

**Michelle K. Dunne**
State Bar No. 12481750

mdunne@bajb.com
Burns Anderson Jury & Brenner, L.L.P.
4807 Spicewood Springs Road
Bldg. 4, Suite 100 Austin, TX 78759
(512) 338-5322
(512) 338-5363 (telecopier)
OF-COUNSEL FOR PLAINTIFFS
*Local Counsel*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I will cause the foregoing to be served upon the Department on July 24, 2023.

E. SCOTT LLOYD